# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LAQUITA DUNLAP,<br>as Personal Representative of the<br>ESTATE OF BRIEON GREEN,<br>Deceased,<br><br>        Plaintiff,<br><br>        v.<br><br>MERLIN H. AMAYA, individually<br>and as an agent and employee of<br>Milwaukee County, Wisconsin; GENE<br>LANGLEY, individually<br>and as an agent and employee of<br>Milwaukee County, Wisconsin;<br>MILWAUKEE COUNTY, WISCONSIN,<br>a municipal corporation; BRITTANY<br>WYSOCKI, individually and as an employee<br>of Wellpath LLC and/or Milwaukee County,<br>Wisconsin; and WELLPATH, LLC, a<br>Tennessee limited liability company,<br><br>        Defendants. | **DEMAND FOR JURY TRIAL** |

# COMPLAINT

Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, Deceased, by and through counsel, Ben Crump Law, Hart McLaughlin & Eldridge, LLC, and The LaMarr Firm, complains as follows against Defendants Merlin H. Amaya, individually and as an agent and employee of Milwaukee County, Wisconsin; Gene Langley, individually and as an agent and employee of Milwaukee County, Wisconsin; Milwaukee County, Wisconsin, a municipal corporation; Brittany Wysocki, individually and as an employee of Wellpath LLC and/or Milwaukee County, Wisconsin; and Wellpath, LLC, a Tennessee limited liability company:

## NATURE OF THE ACTION

1. On June 26, 2022, 21-year-old Brieon Green died by suicide during intake at the Milwaukee County Jail at 949 N. 9th Street, Milwaukee, Wisconsin (the "MCJ").

2. Just two months earlier, on April 29, 2022, Brieon had been deemed a suicide risk during intake on a separate visit to the MCJ. He was placed on suicide watch until May 1, 2022, during that visit. He left the MCJ alive.

3. However, when he returned on June 26, 2022, jail staff, including a nurse and correctional officers, ignored clear signs that Brieon was a suicide risk as well as his recent prior classification on suicide watch.

4. Indeed, Brieon was acting confused, having trouble responding to questions, and was exhibiting behavior suggesting that he was not of sane or sound mind. As a result, correctional officers "front-loaded" him, conducting his intake ahead of others who had come before him, and segregated Brieon by confining him alone in a jail cell.

5. The cell contained a telephone with an elongated metal cord. Within about 30 minutes, Brieon strangled himself to death with the telephone cord.

6. Brieon's death should have been prevented. Not only did jail officials ignore Brieon's history and clear warning signs for suicide risk, but Defendant Deputy Merlin Amaya walked by and looked into the jail cell as Brieon was violently strangling himself. On information and belief, Deputy Amaya witnessed Brieon strangling himself but did not stop, did not signal an emergency, and did not enter the cell to intervene or provide lifesaving care.

7. Tragically, Brieon Green's suicide was one of many suicides in recent years at the MCJ. The MCJ has been plagued by overpopulation, severe understaffing, and an inability to handle persons with mental health crises in their custody.

8. For all of these reasons, Plaintiff Laquita Dunlap, Brieon's mother, brings this action pursuant to 42 U.S.C. § 1983 against both the MCJ staff and entities responsible for operating the jail, to seek redress for Brieon's suffering and untimely death.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the federal questions at issue pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as well as supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Wisconsin. Moreover, all parties reside in the Eastern District of Wisconsin.

## THE PARTIES

11. Plaintiff Laquita Dunlap is the mother of decedent Brieon Green and has been appointed personal representative of Brieon Green's estate. Ms. Dunlap is a citizen of the United States and a resident of Milwaukee County, Wisconsin. Ms. Dunlap sues on behalf of Brieon Green's estate and his survivors.

12. Defendant Merlin H. Amaya is a citizen of the State of Wisconsin and was at all relevant times a deputy sheriff/correctional officer with the Milwaukee County Sherriff's Office at the MCJ.

13. Defendant Gene Langley is a citizen of the State of Wisconsin and was at all relevant times a deputy sheriff/correctional officer with the Milwaukee County Sherriff's Office at the MCJ.

14. Defendant Milwaukee County is a governmental entity within the State of Wisconsin of which the MCJ is a part. The Milwaukee County Sheriff's Office operates the MCJ. Plaintiff sues Milwaukee County pursuant to the U.S. Supreme Court decision of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) and its progeny.

15. Defendant Brittany Wysocki is a registered nurse in the State of Wisconsin. At all relevant times, she was employed by Wellpath LLC, which provided medical services to the jail pursuant to a contract with Milwaukee County, Wisconsin. Therefore, Ms. Wysocki was also an agent of Milwaukee County, Wisconsin.

16. Defendant Wellpath LLC ("Wellpath") is a Tennessee limited liability company. Wellpath contracts with Milwaukee County, Wisconsin, to provide medical care and mental healthcare to county jails. Wellpath began as Milwaukee County's correctional healthcare provider on April 1, 2019. On December 17, 2020, the Milwaukee County Board of Supervisors extended Wellpath's contract for an additional five years, followed by three optional one-year extensions.

**FACTS APPLICABLE TO ALL COUNTS**

17. On June 26, 2022, Decedent Brieon Green was arrested by the Milwaukee County Sheriff's Office in Milwaukee, Wisconsin.

18. Brieon was 21 years old, illiterate, and suffered from cognitive and behavioral disorders that made it difficult for him to process information and communicate.

19. At the time of his death, Brieon had completed five years of high school, but still needed four years to graduate. He had severe mental challenges. For example, Brieon could tell you that he was 21 years old, but he did not know his exact date of birth. If asked for that information, he would typically look to his mother or a sibling to provide it.

20. Minimal discussion with Brieon would demonstrate that he suffered from cognitive deficits, including difficulty following instructions and difficulty communicating.

21. Brieon also suffered from a history of suicidal ideation.

22. Indeed, on April 29, 2022, Brieon was arrested, transported to the MCJ, and classified on "Suicide Watch" due to behaviors suggestive of a suicide risk. On information and belief, such

behaviors included demonstration of mental distress, confusion, and despondency. Brieon held that classification from April 29, 2022, until May 1, 2022. He left the MCJ alive on that occasion.

23. Upon his arrest on June 26, 2022, Brieon exhibited similar behaviors to those causing his prior classification on suicide watch. Such behaviors included demonstrated mental and/or cognitive deficits, mental distress, confusion, and despondency. Upon information and belief, these were the same warning signs that contributed to Brieon's being classified as a suicide risk on April 29, 2022, during his prior visit to the jail.

24. Indeed, after Milwaukee County sheriff's deputies placed him into their vehicle to transport him to MCJ, Brieon banged his head against the squad car cage repeatedly. Deputies called an ambulance and when Brieon declined medical attention, he was taken immediately to the MCJ.

25. Brieon's continued to exhibit bizarre behavior and show severe distress at the MCJ. The correctional staff with whom he interacted did, or should have, appreciated the possibility that Brieon was suicidal. Further, Brieon's records from his recent admission to the MCJ showed that he had recently been classified as a suicide risk and placed on suicide watch for nearly three days.

26. Defendant Deputy Merlin Amaya escorted Brieon and observed Brieon's bizarre and despondent behavior as well as his inability to process information or communicate clearly.

27. Brieon was unable to answer questions about his name and date of birth. When asked, Brieon told Deputy Amaya that he would have to obtain that information from someone else.

28. When asked to move through the jail's body scanner, Brieon looked confused, stood in place for a long time without acknowledging others, and then finally began to move without saying anything.

29. Numerous witnesses — including law enforcement officers and fellow detainees alike — attested to Brieon's confused, unresponsive, and despondent state in their official statements to investigators.

30. Defendant Milwaukee County Sheriff's Deputy Gene Langley, who participated in the pre-booking process with Brieon that day, described Brieon's behavior as "out there" and "acting like he was "lost." Deputy Langley stated that it would take several commands before Mr. Green would appreciate or follow them. When asked to move through the body scanner, Deputy Langley described Brieon as staring at him "like he wanted to say something" but that he had to think about it.

31. On information and belief, Deputy Langley had interacted with Brieon during his April 29, 2022, detention at the MCJ when Brieon had been classified a suicide risk. In his statement regarding this incident, Deputy Langley described interaction with Brieon recently when Brieon had a "disciplinary" issue at the jail — which would have coincided with Brieon's April-May 2022 detention at MCJ.

32. Another witness described Brieon as appearing as if he had a "concussion" or was "on drugs" on June 26, 2022. This same witness and another witness confirmed that jail staff witnessed Brieon's behavior and found it so concerning that they "front-loaded" Brieon through booking, *i.e.*, had him enter the jail before and separately from others.

33. Defendant Brittany Wysocki, a registered nurse at the jail employed by Wellpath, conducted Brieon's medical screening and intake.

34. On information and belief, Ms. Wysocki observed and/or was told about Brieon's bizarre, confused, and despondent behavior.

35. Ms. Wysocki perfunctorily asked Brieon a short battery of questions, including whether Brieon had thoughts of self-harming. On information and belief, during this time, Brieon was exhibiting signs of confusion, distress, and despondency and was not cooperatively answering the suicide risk questions. Ms. Wysocki indicated that Brieon had answered "no" to the battery of questions and authorized his placement in general population without placing him on suicide watch, without referring him for further medical evaluation, or without placing any other special evaluation

or precaution on him. This was despite the outward warning signs of suicide risk and despite the fact that Brieon's records shows that he was recently categorized as a suicide watch. On information and belief, those records were accessible to Ms. Wysocki and others.

36. Thereafter, Deputy Amaya made the decision to place Brieon in a special jail cell, segregated from the general population, without any special oversight or precaution.

37. Brieon's jail cell included a solid door with a square window at its top half. There was limited visibility into the jail cell unless one walked up to the cell and looked inside. However, certain aspects of the cell were visible in surveillance video, as shot from a security camera outside the cell.

38. The jail cell included a bench and a telephone equipped with an elongated metal cord near the bench. The metal telephone cord posed a clear suicide risk. All Defendants were aware of such risk in advance of this event.

39. No one checked on or spoke to Brieon for roughly 30 minutes. During this time, jail surveillance video shows Brieon repeatedly walking up to the cell window and looking out to determine if anyone would come to his aid.

40. Deputy Amaya was responsible for conducting cell checks on Brieon during this time and ensuring his safety in the cell.

41. After no one checked-on Brieon for some time, video shows Brieon pulling the metal phone cord out and yanking on it loudly and repeatedly. Still, no one checked on Brieon during this time, whether they heard the disturbance or noticed the surveillance video showing Brieon's disturbing actions.

42. Eventually, Deputy Amaya walked by Brieon's cell to perform a visual check on him. As he walked past the cell, he looked inside it. At this moment, Brieon was using the metal phone cord to strangle himself. The act was violent and took great strength and Brieon's legs can be seen on video shaking or moving during his tragic self-harming in the cell. On information and belief, Deputy

7

Amaya witnessed Brieon harming himself but did nothing and continued walking without radioing for emergency.

43. Sometime thereafter, another sheriff's deputy walked to Brieon's cell. The deputy looked into the cell and saw Brieon lying there with the metal cord around his neck. At some point, the deputy called for help and when additional personnel arrived, the cell door was open and an attempt at life-saving measures was performed by one or more personnel.

44. They were too late. Brieon died there in the cell.

45. Brieon's death could have been prevented if personnel had taken common sense and reasonable actions, including but not limited to:

   a. Deputy Amaya, Deputy Langley, and/or Brittany Wysocki identifying Brieon as a suicide risk and taking proper precautions as a result.

   b. Deputy Amaya placing Brieon in a cell or any area that did not include a clear suicide risk.

   c. Deputy Amaya checking on Brieon prior to the time he began self-harming.

   d. Deputy Amaya immediately entering the cell when he saw Brieon strangling or attempting to strangle himself.

46. Unfortunately, Brieon's story is not uncommon in recent history at the MCJ. Other detainees have died as a result of suicide both before and after Brieon's death, which could have been prevented by Milwaukee County, Wellpath, and their personnel.

47. Specifically, between January 2020 and April 2021, three detainees died by suicide.

48. Furthermore, on December 16, 2022, 20-year-old Cilivea Thyrion died by suicide after swallowing a diaper.

49. In January 2023, 49-year-old Octaviano Juarez-Corro died by strangling himself.

50. In March 2023, 37-year-old Terrance Mack was found dead in his jail cell.

51. Due to the series of deaths above, including Brieon Green's, the Milwaukee County Board of Supervisors authorized a review into the Milwaukee County Sheriff's Office's policies, procedures, and practices relating to suicide prevention, mental and physical health assessments, and training and staffing at the MCJ, as reflected in Milwaukee County Board Resolution File No. 23-554.

52. Prior to this review, the Milwaukee County Sheriff's Office had admitted that the MCJ has experienced overwhelming staffing shortages, including by way of corrections officers and medical/nursing staff contracted through Wellpath.

53. The National Commission on Correctional Healthcare (the "Commission"), which accredited MCJ in 2021 and reviews MCJ for accreditation in accordance with the Commission's standards, confirmed these admissions in its most recent review of MCJ ending in June 2023. That review looked back three years (to include the time encompassed by Brieon Green's death) and identified significant problems with both staffing and mental/medical intake procedures.

54. Specifically, the Commission noted in pertinent part:

…Numerous staff were working long hours during the three-year accreditation period and doing the best they could with what resources they had. Many short-staffed days required them to make difficult prioritization decisions to get as much as possible accomplished during their shifts.

In addition to the ongoing nursing vacancies (primarily at MCJ) health staff turnover has been extensive over the past 12 months, and has included the [Health Services Administrator], MCJ medical director, [Directors of Nursing], psychiatrist, dentist … [Continuous Quality Improvement Registered Nurse], mental health director, and the infection control RN.

55. The Commission also criticized MCJ's health record system, explaining that:

A primary concern about the health record system is that staff have reported on a number of occasions that the system is down too frequently. This downtime has a negative impact on the ability of health staff to efficiently access records during patient encounters and thus raises the risk of documentation not being completed or not being as comprehensive and accurate as it should be. As an example, [the electronic health record system] was down for approximately three hours during [the Commission's] June [2023] site visit.

56. The Commission also expressed serious reservations concerning Wellpath's screening of detainees upon admission at the MCJ. The Commission stated:

> We will conduct a more detailed review of the receiving process at [MCJ and another facility] during our August [2023] site visit. It will involve a review of the timeliness of the prescreening, receiving screening, documentation, and referral processes.
>
> We have concerns about stipulations in the Wellpath receiving screening policy and procedure to investigate. As written, the policy and procedure are not in compliance and if the stipulations are carried out in actual practice, this essential standard is not being met. We have discussed this matter with the [Health Services Administrator] and she has initiated a review.
>
> The bottom line is that a full receiving screening must be completed every time an individual is booked into either facility. This includes those who are booked in on weekends and those booked in again after having been recently released.

57. Subsequent to the release of the Commission's report, the Milwaukee County Sheriff's Office authored its initial response to Milwaukee County Board Resolution File No 23-554, entitled "Initial Report and Suggested Plans Regarding Milwaukee County Criminal Justice Facility Operations" ("Sheriff's Initial Report").

58. In the Sheriff's Initial Report, it acknowledged the problems at MCJ with respect to suicide screening and follow-up.

59. The Sheriff's Initial report also acknowledged problems observed "[re]lated to mental health care specifically … that Wellpath is understaffed" and that the Sheriff "understands that Wellpath, like the MCJ, is facing significant challenges in hiring and retaining mental health professionals due to the realities of the current job market."

60. The Sheriff's staffing problems are so severe that it has repeatedly been in violation of the consent decree entered in *Christensen, et al. v. Sullivan, et al.*, Case No. 96-CV-001835 (Wis. Cir. Ct., Milwaukee Cty.) (the "Consent Decree").

61. Indeed, as the Sheriff conceded in its Initial Report, "[s]ince the start of the Pandemic in March 2020, the MCJ has been unable to fulfill [the staffing] requirement of the Consent Decree.

The MCJ is severely understaffed." There is currently a 40% vacancy rate for corrections officers, where only 148 of 231 budgeted positions are filled.

62. Understaffing at MCJ had long been an issue before Brieon Green's death. Indeed, one County Board Supervisor, a licensed physician who serves on the State of Wisconsin's medical licensing board, addressed the issue of MCJ understaffing and noted that jails are sometimes forced to hire medical personnel who cannot obtain employment elsewhere because of "long previous records of drug convictions, drug violations, substance abuse issues, psychiatric health."

63. The results of understaffing are more severe given that the MCJ is regularly overpopulated, including on the date of Brieon Green's death.

64. The Sheriff's Initial Report conceded that "[a]s a result of the severe staffing shortages and population issues noted above, mandatory or 'forced' overtime has become a standard procedure to maintain facility operations." The Sheriff has acknowledged that "[t]his overtime puts immense stress on staff."

65. At bottom, the Sheriff has acknowledged that "the three most significant challenges that the MCSO is facing are staffing at the [Milwaukee County Jail], the inability of the medical and mental health service provider, Wellpath LLC, to fully staff the MCJ, and overpopulation at the MCJ."

## COUNT 1
### 42 U.S.C. § 1983 – Fourth Amendment
### (Against Defendant Merlin H. Amaya)

66. Plaintiff incorporates the allegations above as if fully restated here.

67. At the time of his death, Brieon Green had not yet had a probable cause hearing pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975) and, therefore, was protected by the Fourth Amendment of the U.S. Constitution.

68. Defendant Merlin Amaya's actions and omissions with respect to Brieon Green were objectively unreasonable and caused Brieon Green's injuries.

69. Defendant Merlin Amaya was aware of, or should have been aware of, facts demonstrating that Brieon Green required medical attention and/or was a suicide risk, including that he had recently been classified a suicide risk at the jail and been under suicide watch for 2-3 days and that he was exhibiting signs of severe mental distress, despondency, and confusion.

70. Furthermore, on information and belief, Defendant Merlin Amaya witnessed Brieon Green harming himself. Deputy Amaya had personally placed Brieon Green in the cell, had not checked on Brieon prior to that point, and looked into the cell as he walked past it.

71. Despite the above, Defendant Merlin Amaya failed to obtain medical or mental health assistance for Brieon Green and instead placed him in a segregated cell without observation and with clear suicide risks. Further, despite witnessing Brieon Green self-harming, Defendant Merlin Amaya did not intervene to stop it, but rather continued walking ahead without obtaining emergency assistance.

72. As a result, Brieon Green suffered personal injury, severe pain and suffering, emotional distress, and died.

73. Furthermore, Brieon Green's next of kin suffered damages as a result of his wrongful death, including loss of society, companionship, comfort, and services.

74. The acts and omissions of Defendant were intentional, wanton, malicious, and oppressive.

75. Defendant acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendant Merlin H. Amaya, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## COUNT 2
### 42 U.S.C. § 1983 – Fourth Amendment
### (Against Defendant Brittany Wysocki)

76. Plaintiff incorporates the allegations above as if fully restated here.

77. At the time of his death, Brieon Green had not yet had a probable cause hearing pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975) and, therefore, was protected by the Fourth Amendment of the U.S. Constitution.

78. Defendant Brittany Wysocki's actions and omissions with respect to Brieon Green were objectively unreasonable and caused Brieon Green's injuries.

79. Defendant Brittany Wysocki, a registered nurse charged with evaluating Brieon Green's medical and mental condition, particularly for any concern of a suicide risk, was aware of, or should have been aware of, facts demonstrating that Brieon Green required medical attention and/or was a suicide risk, including that he had recently been classified a suicide risk at the jail and been under suicide watch for 2-3 days and that he was exhibiting signs of severe mental distress, despondency, and confusion.

80. Despite the above, Defendant Brittany Wysocki failed to provide or obtain medical or mental health assistance for Brieon Green, failed to classify him as a suicide risk, and facilitated his placement in a segregated cell without observation and with clear suicide risks.

81. As a result, Brieon Green suffered personal injury, severe pain and suffering, emotional distress, and died.

82. Furthermore, Brieon Green's next of kin suffered damages as a result of his wrongful death, including loss of society, companionship, comfort, and services.

83. The acts and omissions of Defendant were intentional, wanton, malicious, and oppressive.

84. Defendant acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendant Brittany Wysocki, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## COUNT 3
## 42 U.S.C. § 1983 – Fourth Amendment
## (Against Defendant Gene Langley)

85. Plaintiff incorporates the allegations above as if fully restated here.

86. At the time of his death, Brieon Green had not yet had a probable cause hearing pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975) and, therefore, was protected by the Fourth Amendment of the U.S. Constitution.

87. Defendant Gene Langley's actions and omissions with respect to Brieon Green were objectively unreasonable and caused Brieon Green's injuries.

88. Defendant Gene Langley was aware of, or should have been aware of, facts demonstrating that Brieon Green required medical attention and/or was a suicide risk, including that he had recently been classified a suicide risk at the jail and been under suicide watch for 2-3 days and that he was exhibiting signs of severe mental distress, despondency, and confusion.

89. Despite the above, Defendant Langley failed to obtain medical or mental health assistance for Brieon Green and failed to intervene when Brieon Green failed to receive proper attention and was instead placed in a segregated cell without observation and with clear suicide risks.

90. As a result, Brieon Green suffered personal injury, severe pain and suffering, emotional distress, and died.

91. Furthermore, Brieon Green's next of kin suffered damages as a result of his wrongful death, including loss of society, companionship, comfort, and services.

92. The acts and omissions of Defendant were intentional, wanton, malicious, and oppressive.

93. Defendant acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendant Gene Langley, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### COUNT 4
### 42 U.S.C. § 1983 — *Monell* Liability / Understaffing
### (Against Defendants Milwaukee County and Wellpath LLC)

94. Plaintiff incorporates the above allegations as if fully set forth here.

95. Defendants Milwaukee County and Wellpath LLC had of policy, pattern, and/or practice of understaffing the MCJ with correctional officers and/or medical and nursing staff. The policy, pattern, and/or practice resulted in regular, systemic understaffing at the MCJ in relevant respects.

96. Defendants Milwaukee County and Wellpath were aware of such systemic understaffing at the jail and further knew that it was deleteriously impacting jail operations, including by making them unable to adequately assess the medical and/or mental health of detainees, adequately house and/or monitor such detainees, and/or ensure detainee safety. There were numerous other suicides at the MCJ, described above, as a result of such deficiencies.

97. As a result of the above failures and by the deliberate indifference of Defendants in this respect, Brieon Green suffered severe pain and suffering and emotional distress and died.

98. Further, as a direct and proximate of the same, Brieon Green's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

99. Defendants Milwaukee County and Wellpath acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution and violated 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendants Milwaukee County and Wellpath LLC, for compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## COUNT 5
### 42 U.S.C. § 1983 — *Monell* Liability / Unconstitutional Policy
**(Against Defendants Milwaukee County and Wellpath LLC)**

100. Plaintiff incorporates the allegations above as if fully restated here.

101. Defendants had a policy, procedure, pattern, and/or practice governing intake of detainees that exhibited deliberate indifference to the risk of suicide. Specifically, such policy included only the perfunctory asking of the detainee whether he was suicidal and, if denied, a history of suicidal ideation and clear signs of mental distress were ignored.

102. Defendants had such a policy despite knowing that suicidal persons regularly deny such tendencies and, further, that the problematic behavior often exhibited by such detainees would result in their segregation into jail cells with clear suicide risks and no monitoring, as occurred with Brieon Green here.

103. Defendants' policies in this respect constituted a violation of Brieon Green's constitutional rights.

104. As a result of the above deliberate indifference, Brieon Green suffered severe pain and suffering and emotional distress and died.

105. Further, as a direct and proximate of Defendants' deliberate indifference, Brieon Green's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

106. Defendants acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution and violated 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendants Milwaukee County and Wellpath LLC, for compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 6
### 42 U.S.C. § 1983 — *Monell /City of Canton* Liability
### for Deliberate Indifference in Training
### (Against Defendants Milwaukee County and Wellpath LLC)

107. Plaintiff incorporates the allegations of paragraphs 65 above as if fully restated here.

108. This count is stated in the alternative, to the extent Defendants failed to recognize the signs that Brieon Green was a suicide risk and failed to review his recent suicide watch records.

109. Defendants failed to adequately train Defendants Amaya, Wysocki, and Langley how to recognize clear warning signs of detainees who pose a suicide risk and failed to train Defendants to review easily accessible historical records for detainees like Brieon Green. In the alternative, Defendants failed to make Brieon Green's historical records available to correctional and nursing staff prior to their being placed in segregated jail cells with clear suicide risks.

110. Defendants' failures were demonstrated by their employees' and/or agents' ignoring and/or failing to identify Brieon Green's risk of suicide and placing him in a segregated cell, unmonitored, with clear suicide risks.

111. Defendants' training failures resulted in the death of Brieon Green as well as other detainees as described above.

112. In the alternative, in light of the duties assigned to Defendants Amaya, Wysocki, and Langley, Defendants' training failures made the need for more or different training so obvious, and the inadequacy of training so likely to result in the violation of citizens' constitutional rights, that Defendants' can be said to have been deliberately indifferent to the need for more training. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 390 (1989).

113. Such a failure to train fairly represents a policy of Defendants such that they are responsible for Brieon Green's death and the failure to train constituted a deliberate indifference to the constitutional rights of citizens like Brieon Green.

114. As a result of the failure to adequately train in these respects, Brieon Green suffered severe pain and suffering and emotional distress and died.

115. Further, as a direct and proximate of the failure to train, Brieon Green's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

116. Defendants acted under the color of state law to deprive Brieon Green of his rights under the U.S. Constitution. As such, it has violated 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Laquita Dunlap, as Personal Representative of the Estate of Brieon Green, deceased, demands judgment against Defendants Milwaukee County and Wellpath LLC for compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims herein.

Date: October 4, 2023                    Laquita Dunlap, as Personal Representative
                                         of the Estate of Brieon Green, Deceased


                              By:    /s/      *John Marrese*
                                     _____
                                          One of the Attorneys for Plaintiff


Ben Crump*
BEN CRUMP LAW
122 S. Calhoun Street
Tallahassee, Florida 32301
(800) 713-1222
ben@bencrump.com

Steven Hart
John Marrese
Julie Murphy*
HART MCLAUGHLIN & ELDRIDGE, LLC
One South Dearborn, Suite 1400
Chicago, IL 60603
(312) 955-0545
shart@hmelegal.com
jmarrese@hmelegal.com
jmurphy@hmelegal.com

B'Ivory LaMarr
THE LAMARR LAW FIRM
5718 Westheimer Road, Suite 1000
Houston, TX 77057
(800) 995-2934
blamarr@bivorylamarr.com

*Attorneys for Plaintiffs*

*\*To seek admission pro hac vice*